**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Stella Hall, | ) | **CASE NO. 1:11 CV 1219** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| The Ohio Bell Telephone Co., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendant. | ) | |


### <u>INTRODUCTION</u>

This matter is before the Court upon Defendant The Ohio Bell Telephone Company's
Motion for Summary Judgment (Doc. 13).  This is an FMLA case.  For the reasons that follow,
the motion is GRANTED.

### <u>FACTS</u>

Plaintiff, Stella Hall, brings this action against defendant, The Ohio Bell Telephone
Company, alleging wrongdoing in connection with plaintiff's termination from employment on
November 9, 2010.

Plaintiff began working for defendant in 2001 as a customer service representative at the

1

Cleveland Call Center ("Call Center").  Plaintiff's employment is governed by a collective

bargaining agreement.  Pursuant to the collective bargaining agreement, defendant pays

employees for FMLA time.

    1.  Plaintiff's FMLA leaves

    On August 28, 2007, plaintiff began crying and hyperventilating at work due to

"personal/family" issues.  As a result, plaintiff was logged out of work for 30 minutes.  On

September 10, 2007, plaintiff sought the help of a psychiatric social worker through defendant's

employee assistance program.   The social worker determined that plaintiff suffered from an

anxiety disorder and recommended a disability leave.  Plaintiff's symptoms included difficulty

focusing and concentrating, as well as difficulty talking for long periods of time.  Plaintiff's

social worker approved 80 hours per month of leave time pursuant to the Family and Medical

Leave Act ("FMLA").  According to the social worker, the purpose of the leave time was to

"relax, regroup, take[] care of her own needs and reduce the stress in her life."  It appears that

defendant reviewed the medical records and approved disability leaves from September 15, 2007

through October 2, 2007, and again from October 2, 2007 through November 8, 2007.  During

the time plaintiff was on disability or FMLA leave[1], she would pray, go to the gym, surf the

internet, write, and talk to her sister.

    In addition to working for defendant, plaintiff wrote novels.  Plaintiff publishes her

novels through her own company, BlacPanther.  Plaintiff began working on her novels before

taking any FMLA leave.  Plaintiff admits that while on FMLA leave, she spent some time

---

[1]     It appears that plaintiff's FMLA and disability leaves overlapped
        at some points.

2

working on a novel.  In addition, in 2007, shortly after plaintiff began to take FMLA leaves, plaintiff marketed her novels through various media.  On October 11, 2007, the Cleveland Call & Post published an article about plaintiff entitled, "STELLA, the hardest working author in Cleveland."  According to the article, plaintiff indicated, "It takes hard work, perseverance and determination.  All [are] factors in trying to make it out here.  How far will you go?  Meaning, are you ready to give up your Saturday or Friday or take off of work to make your dream come true."

In November of 2007, Kimberly Miceli received a copy of the Call & Post article.  Miceli is the Attendance and Force Manager at the Call Center.  Miceli is trained to look for "red flags" that suggest possible FMLA abuse.  Miceli is responsible for reporting suspected FMLA abuse to the Asset Protection Department ("APD").  The APD investigates the alleged abuse.  Upon reading this article, Miceli reported the potential FMLA abuse to the APD.  It appears that plaintiff was on disability leave at the time.  As a result, the article was forwarded to the disability case manager, but no investigation ensued.

In 2008, plaintiff exhausted all 480 hours of FMLA leave by September 8th.[2]  According to defendant, plaintiff was able to work for the remainder of the year.  Thereafter, in January of 2009, plaintiff again began using FMLA leave.  By August of 2009, plaintiff used 472 of 480 hours of leave.  Miceli noticed plaintiff's pattern of using all of her FMLA leave during the first three-quarters of the year and then working for the remainder of the year.  In 2009, Miceli reported her concerns to the APD, which initiated an investigation.  Plaintiff acknowledged that

---

[2]      Neither party explains the approval process for obtaining FMLA leave.

3

she saw a white truck outside her house and assumed that the truck was being used to investigate her for potential FMLA fraud.  It appears that the investigation revealed no wrongdoing.

In January of 2010, plaintiff commenced FMLA leave and used 80 hours in each of January, February, and March.  Plaintiff requested FMLA for every Monday during the beginning of 2010.  An attendance report run on July 29, 2010, shows that as of this date plaintiff exhausted all but 9.75 hours of FMLA leave for 2010.

In 2010, Miceli discovered a hotel confirmation in the name of plaintiff's friend on a printer.  Plaintiff's friend was also under suspicion for FMLA abuse.  The confirmation was for four individuals.  Miceli suspected that plaintiff and her friend were going to use FMLA time for the trip.  Miceli alerted APD, who was prepared to observe plaintiff on the trip.  Plaintiff, however, did not request FMLA leave for this time period.  Miceli later requested that defendant order plaintiff to undergo an independent medical examination ("IME").  Defendant informed Miceli that IMEs are not undertaken to confirm eligibility for FMLA leave.

Throughout the years, plaintiff provided defendant with certifications from the social worker from whom she received counseling.  Although there were some breaks in treatment, plaintiff saw the social worker for counseling throughout the years during which she requested FMLA leave.  There were times, however, when plaintiff requested FMLA leave even though she did not receive counseling.

2.  Plaintiff's work performance

In 2008, defendant suspended plaintiff for two days for "Misuse of Company Time," for spending 52 minutes on a call without a customer on the line.  Thereafter, on September 23, 2009, defendant placed plaintiff on a performance improvement plan due to poor performance

4

and lost revenue numbers.  On October 15, 2009, plaintiff received a "restate" of a first written warning as a result of plaintiff's "continued lack of consistency in [her] overall performance."

On January 10, 2010, plaintiff began reporting to Shaun Smith.  According to plaintiff, Smith "nitpicked" her performance.  Smith regularly held team meetings and made several comments about "patterns of attendance."  Plaintiff claims that the comments were directed at her, as most of the team members were not eligible for FMLA time and defendant had a plan in place to address unexcused absences.  According to plaintiff, Smith informed her that if she "continue[s] to show a pattern we will do something about it and if I seem to be picking on you, my mother died and I came to work the next day."  At the end of February 2010, plaintiff called Lee Jones in human resources and reported that Smith's behavior constituted harassment.  Jones contacted McCarter, Smith's supervisor and the sales manager.  McCarter discussed the comments with Smith and told him he needed to work on his style.  It does not appear that any supervisor discussed alleged FMLA harassment and Smith was not disciplined.

On May 4, 2010, Smith held a "coaching" meeting with plaintiff.  During the meeting, plaintiff demanded that a union steward be present.  Smith denied plaintiff's request on the grounds that the meeting was not disciplinary in nature.  The following day, Smith held a meeting with plaintiff and McCarter.  Two union representatives were present at the meeting. Smith agreed that a union representative could be present at all future meetings.  Plaintiff requested a transfer to a different team and McCarter granted the request.

On July 1, 2010, defendant transferred plaintiff to Tiffany Ferrell's sales team.  Plaintiff continued to have performance issues.  On July 23, 2010, plaintiff received a first written warning due to a continued lack in overall performance.  Plaintiff believed that Ferrell also was

"nitpicky,"  On September 16, 2010, defendant placed plaintiff on final written warning.  The letter cautioned that any further "chargeable absences" could result in termination.

### 3.  Funeral leave

On August 30, 2010, plaintiff informed Miceli that her "grandchild" had died.  Plaintiff provided Miceli with a letter from the funeral home indicating that the funeral home was "entrusted with the arrangements of Aria, the grandchild of [plaintiff]."  The collective bargaining agreement affords employees with bereavement leave for the death of grandchildren.  It does not, however, afford bereavement leave for the death of a step-grandchild.  At the time of the death, plaintiff was 41 years old.  According to plaintiff, defendant should have known that it was highly unlikely that plaintiff was requesting leave for the death of a biological grandchild.

Domain Ebony Hall ("Ebony") is the daughter of plaintiff's husband.  Aria was Ebony's daughter, who died of cancer on August 26, 2010.  Ebony occasionally stayed with plaintiff and her husband while growing up.  Ebony stopped coming to plaintiff's home around age 14 or 15.  Plaintiff testified that she does not know Ebony's address or telephone number, but she occasionally speaks to Ebony through plaintiff's son.  Plaintiff does not know the name of Ebony's youngest child.  In discussing the situation with her social worker, plaintiff referred to Aria as "her husband's daughter's eight-year-old daughter."  At Ebony's request, plaintiff was not listed as a grandparent in Aria's obituary.  It is unclear where this obituary was published.

Plaintiff was on vacation when she learned through Facebook that Aria died.  Ferrell offered to post information about the services on defendant's notification board, but plaintiff refused.  Ferrell then attempted to obtain information about the funeral services.  She received the following text from plaintiff, "2nite @ 8 pm 3 lutheran and putius nean @ not 3."  Ferrell,

however, did not text or call plaintiff in response to the message.  Ferrell became suspicious and telephoned the funeral home that provided the note to defendant.  The funeral home indicated that it did not have any record of Aria in its system.  In addition, there was no obituary listed in the Plain Dealer.  On September 3, 2010, plaintiff came in to work to pick up her check.  She was on funeral leave that day.  Upon returning to work after the expiration of the leave period, plaintiff asked her teammates to donate money for burial expenses.  Plaintiff used the money to put gas in her car and gave some of the money to her mother.  Based on the foregoing, Ferrell initiated an investigation into possible funeral leave fraud.

Believing that plaintiff fabricated the death, the APD commenced an investigation.  On September 23, 2010, an APD analyst visited the funeral home.  The funeral home indicated that it did not handle the arrangements and had no record of Aria in the funeral home's obituaries. On September 30, 2010, the APD investigator interviewed plaintiff while two union representatives were present.  The investigator asked plaintiff whether Ebony Hall is her biological daughter.  Plaintiff initially refused to answer the question but, after conferring with her union representative, plaintiff indicated that Ebony is her step-daughter.  Following the interview, defendant suspended plaintiff pending the investigation.  APD verified that Aria had in fact died.  On October 18, 2010, defendant suspended plaintiff pending termination. Thereafter, on November 9, 2010, defendant terminated plaintiff for misuse of bereavement leave.

Plaintiff filed this lawsuit asserting one claim for relief.  Count one is a claim for retaliation asserted under the FMLA.  Defendant moves for summary judgment and plaintiff opposes the motion.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

8

> depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

### ANALYSIS

1.  Serious health condition

Defendant argues that it is entitled to summary judgment because no reasonable juror

could conclude that plaintiff suffers from a "serious health condition," as required under the

FMLA.

In order to be entitled to protection under the FMLA, plaintiff must be able to establish

that she suffered from a "serious health condition" that makes her unable to perform the

functions of her job.  *See*, 29 U.S.C. § 2612(a)(1)(D).  A serious health condition is defined as:

> (a) Incapacity and treatment. A period of *incapacity* of more than three consecutive, full
> calendar days, and any subsequent treatment or period of incapacity relating to the same
> condition....

***

> (c) Chronic conditions. Any period of *incapacity* or treatment for such incapacity due to a
> chronic serious health condition. A chronic serious health condition is one which:
>
> > (1) Requires periodic visits (defined as at least twice a year) for treatment by a
> > health care provider, or by a nurse under direct supervision of a health care
> > provider;
> >
> > (2) Continues over an extended period of time (including recurring episodes of a
> > single underlying condition); and
> >
> > (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma,
> > diabetes, epilepsy, etc.).

***

Defendant argues that plaintiff cannot establish that she suffered from a serious health

condition because she cannot show she was "incapacitated."  Defendant relies on plaintiff's own

testimony, wherein she avers as follows:

> Q: After your FMLA time ran out, for the last couple of months of the year [in 2008], you
> were able to go to work; correct?
>
> A: Two-part answer.  Yes, and I had to work through it with my anxiety, and I wrote.  I

10

wrote in between my customers to calm down my anxiety;

Q: So it was difficult– would it be accurate to say that it was difficult for you to work with your medical conditions, but you were able to do it?

A: Yes.

***

Q: And would it be the same thing for 2009, you similarly ran out of the FMLA time before the end of the year; correct?

A: Yes.

Q: And with difficulty, you were able to work in your position for the last couple of months of the year until you had new FMLA time on January 1st, correct?

A: Yes.

According to defendant, this testimony conclusively establishes that plaintiff was not incapacitated and, thus, not entitled to FMLA leave. Defendant further points out that plaintiff was able to engage in regular daily activities, including promoting her novels, while on FMLA leave. In addition, defendant points to the testimony of plaintiff's own medical provider, who testified that plaintiff suffered from only a "slight" impairment in occupational functioning and showed steady improvement. As such, any claim for retaliation fails because plaintiff cannot establish that she suffered from a "serious health condition."

In response, plaintiff points out that she routinely obtained medical certifications from a licensed social worker who diagnosed plaintiff with an anxiety disorder. The forms indicate that plaintiff suffers from a "chronic condition." Plaintiff further points out that she regularly received treatment from the social worker during the entire time period at issue. Moreover, plaintiff claims that defendant's own independent medical evaluation, *i.e.* the review by the disability board, confirmed the opinion of the social worker. Plaintiff also points out that

11

defendant's records establish that it routinely and repeatedly approved plaintiff's requests for

FMLA leave.

Upon review, the Court finds that plaintiff points to evidence supporting a conclusion

that she suffered from a serious health condition.  As an initial matter, plaintiff provides records

from a health care provider repeatedly certifying that plaintiff suffered from a chronic condition

which may cause "episodic, rather than a continuing period of *incapacity*."  Moreover, it appears

that defendant accepted and approved plaintiff's requests for FMLA leave for a period of *years*.

Throughout  this entire time period, plaintiff sought medical treatment on a periodic basis.

While defendant points out that there were periods of time where plaintiff did not seek

counseling, some of these period do no overlap times she requested FMLA leave.  Moreover, at

least initially, defendant's own experts agreed with the determination made by plaintiff's health

care provider.  Defendant offers no medical evidence to the contrary.  Thus, the fact that plaintiff

may not have been "incapacitated" during certain periods, does not mean that plaintiff was *never*

entitled to FMLA at any point in time.  Defendant in no way addresses this issue.  The fact that

plaintiff may have testified that she was capable of working during non-FMLA approved work

periods does not conclusively establish that she was not suffering from a "serious health

condition."  On the whole, the Court finds that sufficient evidence exists from which a jury could

conclude that plaintiff suffered from a "serious health condition.[3]"

---

[3]     Defendant relies on *Bauer v. Varity Dayton-Walther Corp.*, 118
F.3d 1109 (6th Cir. 1997), *Morris v. Family Dollar Stores of Ohio,
Inc.*, 20 Fed. Appx. 330 (6th Cir. 2009), and *Whitworth v.
Consolidated Biscuit Co.*, 2007 WL 1075774 (E.D. Ky. 2007) in
support of its position that plaintiff cannot establish that she
suffered from a serious health condition.  Those cases are readily
distinguishable, however, in that the employees did not provide

2.   Causal connection

In her complaint, plaintiff alleges that she was terminated in violation of the FMLA. Pursuant to 29 U.S.C. §§ 2612(a)(1)(C) and (D), plaintiff is "entitled to a total of 12 workweeks of leave during any twelve month period... in order to care for the...parent of the employee [suffering from] a serious health condition..." or "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  "An employer may not retaliate against an employee for taking leave under the FMLA."  *Spurlock v. Peterbilt Motors Company, Inc.,* 58 Fed. Appx. 630 (6th Cir. Feb. 19, 2003) (citing 29 U.S.C. § 2615; 29 C.F.R. § 825.220(c)).  Where a former employee alleges that she was terminated for exercising her rights under the FMLA, the Court applies a traditional employment discrimination analysis.

In this case, plaintiff does not provide direct evidence in support of her claim.  As a result, the *McDonnell Douglas* burden-shifting analysis applies to plaintiff's FMLA claim. *Gibson v. City of Louisville,* 336 F.3d 511 (6th Cir. 2003).  Thus, plaintiff must first establish a *prima facie* case by showing that:

> (1) [s]he availed [herself] of a protected right under the FMLA; (2) [s]he was adversely affected by an employment decision ...; and (3) the proximity in time between [the] request for leave and [the adverse employment action establishes] a causal connection between [her] exercise of a right under the FMLA and the adverse employment decision.

*Watkins v. Hill's Pet Nutrition, Inc.,* 63 Fed. Appx. 185 (6th Cir. April 8, 2003) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

_____

> evidence from medical sources and the employers did not grant the employee's FMLA leave requests over a period of years.  In fact, the employers rejected the request for FMLA leave in the first instance.

13

If plaintiff is able to establish a *prima facie* case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  Once this burden is satisfied, the burden shifts back to plaintiff, who must then present evidence that the proffered reason was in fact pretext for unlawful discrimination.  *Gibson,* 336 F.3d at 513 (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153-54 (2000)).  The plaintiff need not prove that discrimination was the sole factor motivating the adverse action.  Rather, plaintiff need only demonstrate that it was "*a* determining and motivating factor." *Id*. at 514 (emphasis in original).

The Court now turns to whether plaintiff presented sufficient evidence to establish a *prima facie* case of termination in violation of the FMLA.  Defendant, in addition to arguing that plaintiff did not suffer from a "serious health condition," argues that plaintiff cannot point to evidence sufficient to satisfy the "causal connection" element required to establish a *prima facie* case.

"A plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one."  *Hobart v. Behavioral Connections of Wood County, Inc.*, 2004 WL 1474652 (N.D. Ohio June 17, 2004)(citations and quotations omitted).  "The element of causation can be inferred from a number of factors, including the timing of [the discharge] vis-a-vis [the] request for FMLA leave...."  *Swanson v. Senior Resource Connection*, 254 F.Supp.2d 945, n.5 (S.D. Ohio 2003).

Defendant argues that plaintiff cannot rely on "temporal proximity" to establish a causal connection because plaintiff had been taking FMLA leave for the three years prior to her termination.   In addition, defendant points out that plaintiff had performance issues and was on

14

"final written warning" at the time of her termination.  According to defendant, to the extent plaintiff intends to rely on Smith's allegedly harassing conduct, such reliance is misplaced because there is no evidence of harassment and Smith did not participate in the decision to terminate plaintiff.  In response, plaintiff points out that defendant has never fired anyone for "mis-identifying" a step-relative as a biological relative.  Plaintiff argues that defendant's compensation structure for its management encourages limiting employee's use of FMLA leave. In addition, plaintiff points out that defendant instituted a number of investigations into plaintiff's purported FMLA fraud.  Defendant did not investigate Smith after plaintiff accused him of harassing her.  Nor did defendant discipline other managers for violations more serious than plaintiff's funeral leave violation.  Plaintiff also claims that defendant included plaintiff's remaining FMLA leave time in its request to investigate plaintiff for funeral leave fraud. Because FMLA time is wholly irrelevant to a funeral leave fraud investigation, evidence exists supporting an inference that defendant terminated plaintiff based on FMLA leave rather than alleged funeral leave fraud.  In reply, defendant argues that its actions regarding Smith and other managers are not relevant to whether a causal connection exists between plaintiff's termination and the exercise of FMLA rights because they are not similarly situated employees.  The evidence does not support plaintiff's assertion that the pay structure penalizes managers for allowing employees to take FMLA leave.  Defendant further points out that it is entitled to investigate plaintiff for misusing FMLA leave.

Upon review, the Court finds that sufficient evidence exists to establish a *prima facie* case.  A review of the records demonstrates that plaintiff used 45 hours of FMLA time in July, the month prior to her request for funeral leave.  In addition, although it appears to be a standard

15

form, the form requesting an investigation into potential funeral leave fraud indicates that plaintiff only has "1.75 hours" of FMLA leave time remaining.  The Court finds that this is sufficient to satisfy plaintiff's low burden of presenting evidence from which a jury could determine the existence of a causal connection.

Defendant argues that it has presented a legitimate, nondiscriminatory reason for termination.  According to defendant, plaintiff cannot demonstrate that its reason, *i.e.*, funeral leave fraud, is pretext for retaliation.

The parties agree that in order to establish pretext, plaintiff must present evidence that the proffered reason for termination (1) lacks a factual basis; (2) did not actually motivate the discharge; or (3) was insufficient to motivate the discharge.  *See, e.g.*, *Marks v. Ohio Bell Telephone Co.*, 2011 WL 3322594, at *7 (N.D. Ohio 2011).

Defendant argues that plaintiff admits she received funeral leave for which she was not entitled.  In addition, it is undisputed that funeral leave fraud is a violation of defendant's Code of Business Conduct, which prohibits dishonesty in the workplace and warns that termination could result from a single violation.  Defendant further points out that it allowed plaintiff to take FMLA for years without terminating her.  Defendant claims that plaintiff cannot show that the proffered reason is insufficient to motivate the discharge because no similarly situated employee received different treatment.  After plaintiff's termination, another employee (who had also used FMLA leave) requested funeral leave for the death of her mother-in-law.  Upon return, the employee admitted that the decedent was actually her step-mother-in-law.  Like plaintiff, this employee was suspended pending termination for funeral leave fraud.  However, unlike plaintiff, this employee had a 37-year flawless performance history and voluntarily disclosed the fact that

16

the decedent was a "step" relative.  Therefore, this employee was given a "return to work" slip.

In this case, until plaintiff's union representative so instructed, plaintiff did not voluntarily

disclose the relationship between herself and her step-grandchild.  In addition, plaintiff had

significant performance issues.

In response, plaintiff refers the Court to the facts cited in support of her *prima facie* case.

She further argues that the investigation into the funeral leave fraud demonstrates that an

employee "not using" FMLA leave would not have been fired.  Defendant "seized" on the fact

that plaintiff learned of the death of her step-granddaughter through facebook and, according to

plaintiff, there is nothing suspicious about learning of the death of a family member on facebook.

In addition, plaintiff argues that the ambiguous text messages could have been clarified if

defendant had sent a return text.  Moreover, although defendant called the funeral home, no call

was made to the director of the funeral home who authored the letter regarding the death.

Plaintiff claims that at no point did defendant investigate whether the child was a "step" relative.

Rather, the investigation focused only on whether the child in fact died.  Even after plaintiff

admitted the child was her step-granddaughter, defendant continued to focus the investigation on

whether the child died.  Only after the investigation confirmed the child's death did defendant

determine that plaintiff's use of funeral leave for a step-relative warranted termination.

Upon review, the Court finds that defendant is entitled to summary judgment because

plaintiff fails to present sufficient evidence from which a jury could conclude that defendant's

proffered reason for termination was pretext for FMLA retaliation.  As an initial matter, the

Court agrees with defendant that plaintiff does not dispute that she utilized funeral leave for a

step-grandchild and that such leave is not covered by the collective bargaining agreement.  As

17

such, there is a basis in fact for the termination.  In addition, defendant suspended another employee pending termination for utilizing funeral leave for a step-relative.  Although that individual was ultimately provided a "return to work" slip based on circumstances not present in plaintiff's work history, it demonstrates that defendant treats the use of funeral leave for step-relatives as a serious offense which may warrant termination.  Thus, plaintiff fails to present evidence demonstrating that her conduct was insufficient to motivate her discharge.

The Court further finds that plaintiff fails to present sufficient evidence demonstrating that her use of funeral leave for a step-relative did not actually motivate the discharge.  In support of her argument, plaintiff claims that defendant's compensation structure encourages managers to "target" employees who use FMLA leave.  At best, however, it is unclear whether managers are penalized for the lack of sales made by employees on FMLA leave.  On the one hand, Smith testified as follows:

Q: Your testimony is even though I'm losing an employee for a number of days where he or she cannot sell, that doesn't present a potential problem for me getting maximum gross sales...?

A: Well, math would say yes. If they're not hitting their goal and you're expected to hit that goal, it would depend on a number of things. How many people on your team are using that benefit, do you have over achievers on the team that help balance out the person who's not there.  So there's several factors that go into it.

At the same time, however, Smith also testified as follows:

Q: Do the protected absences affect the success of your team?

A: No.

Q: Why not?

A: They're protected and they're not – we're not held accountable to protected time.

The Court cannot say that this testimony, as a whole, indicates that defendant

18

compensates managers who have team members utilizing FMLA leave less favorably than managers who do not.  Moreover, as defendant points out, there is no indication that any compensation policy influenced manager Scott Willis's decision to terminate plaintiff.

Plaintiff further points out that she complained that Smith "harassed" her regarding FMLA leave and that her complaint was "almost completely ignored."  Plaintiff further points to other individuals who were not disciplined.  This evidence, however, does not relate to defendant's decision to terminate plaintiff.  As an initial matter, plaintiff's request to transfer off of Smith's team was granted.  In addition, there is no indication that Smith participated in the decision to terminate plaintiff.  Moreover, the incidents that plaintiff complains of regarding other employees are not relevant.  There is no indication that any of these employees are similarly situated or that any of the conduct is akin to the misuse of funeral leave.  Accordingly, this evidence does not support plaintiff's argument that defendant's proffered reason did not actually motive it to terminate plaintiff.

Plaintiff notes that the investigation request submitted in order to commence the investigation into alleged funeral leave fraud identifies the number of hours of FMLA time remaining for the year.  This, however, appears to be a form request.  Nothing in the body of the request suggests that defendant believed FMLA time was at all relevant to the investigation.  While the temporal proximity of the form may provide evidence at the prima facie stage, the form is insufficient, either alone or in combination with the other evidence discussed herein, to establish pretext.

Plaintiff also points out that defendant investigated her for misuse of FMLA time on more than one occasion.  The Court does not find this to be sufficient evidence to support a

pretext argument.  As defendant points out, it is allowed to investigate plaintiff for suspected

misuse of FMLA leave.  Defendant notes that plaintiff had a particularly suspicious pattern of

FMLA use, *i.e.*, she would utilize nearly all 12 weeks of leave during the first three-quarters of

the year and then was able to work with "great attendance" for the remainder of the year.  Then,

once her eligibility for FMLA leave returned, she always sought 80 hours of leave in January.  In

addition, defendant believed that plaintiff stated the following to an interviewer regarding her

writing career, "are you ready to ... take off work to make your dream[s] come true?"  Based on

these facts, the Court cannot say that defendant's investigations into plaintiff's FMLA leave

were improper.  If anything, the fact that defendant continued to grant full FMLA leave to

plaintiff for a period of *years* without terminating her employment, cuts against a finding that

defendant's proffered reason for terminating plaintiff is pretext.

The Court also rejects plaintiff's argument that defendant improperly investigated the

funeral leave fraud.  Plaintiff points to nothing suggesting that the investigation was a "cover"

for FMLA retaliation.  Defendant was informed by plaintiff that her grandchild died and that she

learned of the death on facebook.  Defendant telephoned the funeral home and was informed that

the funeral home had no record of the child's death.  No obituary was published in the Plain

Dealer.  Defendant received confusing texts directly from plaintiff regarding the funeral

arrangements.  There was certainly sufficient cause to commence an investigation.  Plaintiff

takes issue with the fact that defendant did not immediately inquire as to the biological status of

the child and should have presumed, based on plaintiff's age and the age of the child, that

plaintiff could not be the child's biological grandmother.  In essence, it appears that plaintiff is

claiming that defendant did not believe that the child died and focused its investigation on that

fact rather than the biological relationship between plaintiff and the child.  Even if plaintiff's argument is accepted, there is nothing indicating that the investigation or subsequent termination was motivated by plaintiff's use of FMLA leave.  The fact that defendant ultimately learned (after plaintiff's union representative encouraged her to disclose the information) of the nature of the relationship and terminated her on that basis is not evidence that plaintiff was terminated in violation of the FMLA.[4]

Because plaintiff fails to introduce sufficient evidence from which a jury could conclude that defendant's proffered reason for termination is pretext for FMLA retaliation, her claim fails as a matter of law.

**CONCLUSION**

For the foregoing reasons, Defendant The Ohio Bell Telephone Company's Motion for Summary Judgment (Doc. 13) is GRANTED.

IT IS SO ORDERED.


  /s/Patricia A. Gaughan
PATRICIA A. GAUGHAN
Date  7/31/12                    United States District Judge

---

[4]     Having concluded that plaintiff fails to present sufficient evidence
to establish pretext, the Court need not address defendant's "honest
belief" argument.

21